USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/18/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GENARO CAMPOS,

                                        Plaintiff,

                  -against-

ANDREW M. SAUL[1],
Commissioner of Social Security,

                                        Defendant.

---

18cv9809 (DF)

**ORDER**

In this Social Security action, plaintiff Genaro Campos ("Plaintiff"), proceeding *pro se,*

seeks review of the final decision of the defendant Commissioner of the Social Security

Administration ("SSA") ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental

Security Income ("SSI") under the Social Security Act (the "Act") on the ground that, for the

relevant period, Plaintiff's impairments did not render him disabled under the Act.  Currently

before the Court is the Commissioner's motion, pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure, for judgment on the pleadings affirming the Commissioner's decision.

(Dkt. 16.)  Also before the Court is Plaintiff's opposition to Defendant's motion (Dkt. 18),

which, as discussed below, this Court construes as a cross-motion for judgment on the pleadings

in his favor.  For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings is granted, Plaintiff's cross-motion is denied, and the decision of the Commissioner is

affirmed.

---

[1] Andrew M. Saul, having been appointed Commissioner of the Social Security
Administration ("SSA"), is substituted for Acting Commissioner Nancy A. Berryhill, pursuant to
Federal Rule of Civil Procedure 25(d).

## BACKGROUND[2]

Plaintiff filed an application for SSI benefits on April 24, 2015, alleging a disability onset date of August 1, 2012, based on the alleged conditions of "Stage 3 cancer" and "GIST[3] tumor resection."[4] (*See* R. at 208.) Although, in the Function Report that he submitted in connection with his application, Plaintiff also indicated that he was "very h[y]per," that he "g[o]t very anxious," that he could "only deal with one thing at a time," and that his pain medication made him "irritated" and susceptible to "mood changes" (*id*. at 224, 225, 227), the disability adjudicator noted a communication from Plaintiff indicating that his "major issue for filing for benefits relate[d] to his gastric tumor which had been resected," and that Plaintiff did "not want [the agency] to pursue [or] assess his mental issues, PTSD [post-traumatic stress disorder] or anxiety" (*id*. at 107).

Plaintiff's claim for SSI was initially denied on June 8, 2015 (*see id*. at 96-102), and, upon the adjudicator's apparent review of additional medical records, it was again denied on July 20, 2015 (*see id*. at 103-11). Thereafter, on September 3, 2015, Plaintiff, through counsel, requested a hearing before an administrative law judge ("ALJ"). (R. at 122.) On July 28, 2017, ALJ Sharda Singh held a hearing (the "Hearing") at which Plaintiff testified in response to questioning by his attorney and the ALJ. (*See id.* at 43-95.) In large measure, and despite the

---

[2] The background facts set forth herein are taken from the Social Security Administration ("SSA") Administrative Record (Dkt. 13) (referred to herein as "R." or the "Record").

[3] A Gastrointestinal Stromal Tumor ("GIST") is a tumor located in the digestive system. *Gastrointestinal stromal tumor (GIST),* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/gastrointestinal-stromal-tumors/cdc-20387715 (last visited Feb. 4, 2020).

[4] At the same time, Plaintiff also filed an application for Disability Insurance Benefits ("DIB") (*see* R. at 180-86), but he was notified on May 1, 2015 that he did not qualify for such benefits because he had "not worked long enough under Social Security" (*id*. at 114-16), and the denial of his claim for DIB is not at issue before the Court.

initial focus of his claim on his cancer and cancer surgery, much of Plaintiff's testimony related to alleged psychiatric impairments.  (*See generally id.*)  In a decision dated November 7, 2017, ALJ Singh found that Plaintiff had the impairments of both post-traumatic stress disorder and gastrointestinal cancer in remission (*id.* at 15), but further found that Plaintiff nevertheless had the residual functional capacity ("RFC") to perform light work with certain restrictions (*id.* at 17), and therefore was not disabled under the Act (*id.* at 26).

On November 30, 2017, Plaintiff requested review of the ALJs decision by the Appeals Council.  (*Id.* at 177.)  The Appeals Council denied Plaintiff's request for review on September 28, 2018 (*id.* at 6), rendering the ALJ's decision the final decision of the Commissioner.

### A.  Plaintiff's Personal and Employment History

Plaintiff was born on July 23, 1964 (*id.* at 204), such that he was 50 years old at the time of the filing of his application for SSI benefits, and 53 years old as of the date of the ALJ's decision.  At the Hearing, Plaintiff reported that he had a GED and some college education, and that he had been incarcerated for 24 years.  (*Id.* at 63.)  Plaintiff was hired at Promesa as an Operations Aide for its methadone treatment program on January 24, 2017, but, after a probationary period, his employment there was terminated on May 24, 2017.  (*Id.* at 388.) Plaintiff also reported that, at the time of the Hearing, he would occasionally teach classes at a gym.  (*Id.* at 53-54.)  Plaintiff's application for SSI benefits also indicates that he had worked as an actor from October to December of 2014, and again in March 2015, until that job ended for "non-disability related reasons."  (*Id.* at 208-09.)

In an undated letter addressed to "Your Honor" (presumably the ALJ), William Torres ("Torres"), Plaintiff's former supervisor at Promesa, described the reasons for Plaintiff's

termination from his job there, stating that, while Plaintiff had "really tried his best to keep his job," he "could not meet [] expectations." (*Id*. at 269.) He explained that Plaintiff's "co-workers were in "constant disagreement" regarding his hire, due to his "paranoid" and "hyper" ways and his habit of "talk[ing] to himself." (*Id.* at 269.) According to Torres, Plaintiff made his co-workers "nervous," and, in particular, made them "afraid" to get certain keys that they needed to perform their duties, as it required them to approach Plaintiff from behind, which Plaintiff would not allow. (*Id.*) Torres also stated that Plaintiff had claimed that his co-workers were "conspiring against him so that he would not get hired." (*Id.*) Torres noted that Plaintiff had a "great work ethic and [a] strong desire for helping people suffering from addiction," but concluded that he was "not sure whether [Plaintiff] [could] ever forget those 28 years" in prison,[5] and "the 'Jailhouse Mentality' he ha[d] grown to trust." (*Id.*)

### B.     Medical Evidence

The relevant period under review on Plaintiff's claim for SSI benefits runs from April 24, 2015, the date on which Plaintiff applied for those benefits,[6] to November 7, 2017, the date of the ALJ's decision. 20 C.F.R. §§ 416.330, 416.335; *Barrie on behalf of F.T. v. Berryhill*, No. 16cv5150 (CS) (JCM), 2017 WL 2560013, at *2 (S.D.N.Y. June 12, 2017) (adopting report and recommendation). In the following section, the Court will summarize the evidence that was before the ALJ when she rendered her decision; that evidence included medical records both

---

[5] Plaintiff testified at Hearing that he had been incarcerated for 24 years. (*Id., at 63.) The source of the discrepancy between Plaintiff's testimony and the letter from Torres is unclear.

[6] The Court notes that the ALJ identified the date of Plaintiff's application as March 13, 2015, apparently based on an appointment notice sent by the SSA to Plaintiff to inform him of his appointment to apply for benefits on April 24, 2015. (*Id.* at 112-13.) As the Court finds that the ALJ's decision that Plaintiff was not disabled was free from material legal error and was based on substantial evidence (*see* Discussion, *infra*, at Section III), the discrepancy is immaterial.

pre-dating the relevant period (which the Court will reference here, where relevant) and within the period under review. The Court will separately summarize any additional medical evidence submitted by Plaintiff to the Appeals Council and to the Court.

It should be noted, though, that, in responding to the Commissioner's motion for judgment on the pleadings, Plaintiff has only challenged that aspect of the ALJ's decision that found that Plaintiff's psychiatric impairments were insufficient to preclude him from working. Accordingly, although the Court will summarize the evidence relating to both Plaintiff's physical and psychiatric conditions, it will summarize the former with relative brevity.

## 1. **Evidence of Physical Impairments**

With respect to his cancer and other physical conditions, the Record reflects that Plaintiff attended appointments prior to and during the relevant period with (1) Lawrence Medical Associates, P.C. (where he saw oncologists Drs. Zahra Shafaee and Ahmed Asif), and (2) Muhammad Naeem Physicians P.C. (where he saw internists Drs. Muhammad Naeem and Asma Naeem, and geriatrician Adnan Yunus). Given that Plaintiff alternated visits between these two medical practices, the Court addresses his treatment in chronological order.

### a. **Evidence Pre-Dating the Relevant Period**

On October 20, 2014, upon a referral by Dr. Sharfaee, Plaintiff received a CT scan at New York-Presbyterian/Lawrence Hospital. (*Id*. at 280.) Dr. Gregory Sica, who conducted the CT scan, reported largely normal findings, while noting a "mildly enlarged" liver and prostate gland and "a few-mm prostatic calcification." (*Id.*) Dr. Sica also noted that there were "surgical

sutures along the duodenal-jejunal junction and left abdomen," but "no locally recurrent mass,"[7]

and concluded that Plaintiff had "mild hepatomegaly."[8]  (*Id.*)

On October 27, 2014, Plaintiff was examined by Dr. Shafaee for complaints of an

inguinal hernia,[9] which Plaintiff claimed restricted his ability to perform strenuous activities.

(*Id.* at 357.)  Plaintiff's exam returned a number of abnormal findings, including a change in

appetite, weight loss, dysuria,[10] and lymphadenopathy.[11]  (*Id.* at 358.)  Dr. Shafaee

recommended "hernia repair with mesh" and scheduled surgery for Plaintiff on November 4,

2014.  (*Id.*)  Dr. Shafaee also noted Plaintiff's history of a malignant GIST, recommended

follow-up with a medical oncologist, and referred Plaintiff to Dr. Asif.  (*Id.*)  At this time, it was

---

[7] As reported by Plaintiff, and as claimed in his application for SSI (*id.* at 208), he underwent surgery in August 2013 for his GIST (*see id.* at 354 (reporting removal of tumor); *see also id.* at 350 (noting Plaintiff's report that he had been operated upon for a large GIST, "stage 3 he says"); *id.* at 307).

[8] Hepatomegaly is "enlargement of the liver." STEDMAN'S MEDICAL DICTIONARY 404310 (Westlaw 2014).

[9] "An inguinal hernia occurs when tissue, such as part of the intestine, protrudes through a weak spot in the abdominal muscles."  *Inguinal hernia,* MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 (last visited Feb. 4, 2020).

[10] Dysuria is "difficulty or pain in urination."  STEDMAN'S MEDICAL DICTIONARY 275670 (Westlaw 2014).

[11] Lymphadenopathy is enlargement greater than one centimeter in more than one lymph node.  *Lymphadenopathy,* MERCK MANUAL, https://www.merckmanuals.com/professional/cardiovascular-disorders/lymphatic-disorders/lymphadenopathy (last visited Feb. 4, 2020).

recorded that Plaintiff's medications were diphenhydramine,[12] ergocalciferol,[13] Gleevec,[14] and omeprazole.[15]  (*Id.*)  It should also be noted, as relevant to Plaintiff's psychiatric conditions (described *infra*), that Dr. Shafaee also reported, at this visit, that Plaintiff exhibited "difficulty concentrating," "inappropriate interaction," and was "inconsolable."  (Id.)

On November 17, 2014, Plaintiff was again examined by Dr. Shafaee, who noted that Plaintiff was then "post-op" for a hernia repair and was "doing well."  (*Id.* at 354.)  On November 20, 2014, Plaintiff was then examined by Dr. Asif, who noted Plaintiff's report that, since his earlier cancer surgery (*see supra*, at n.7), he had been experiencing weight loss, as well as abdominal pain, diarrhea, and nausea.  (*Id.* at 350.)  Plaintiff was directed to continue taking the same prescribed medications.  (*Id.* at 350-51.)  Plaintiff requested a prescription for medical

---

[12] Diphenhydramine (brand name Benadryl) is used to relieve allergy symptoms, as well as for the prevention of nausea, vomiting, and dizziness.  *Antihistamine (Oral Route, Parenteral Route, Rectal Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/antihistamine-oral-route-parenteral-route-rectal-route/description/drg-20070373 (last visited Feb. 4, 2020).

[13] Ergocalciferol "is the form of vitamin D used in vitamin supplements."  *Vitamin D And Related Compounds (Oral Route, Parenteral Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/vitamin-d-and-related-compounds-oral-route-parenteral-route/description/drg-20069609 (last visited Feb. 4, 2020).

[14] Gleevec (imatinib) "is used alone or together with other medicines to treat different types of cancer or bone marrow conditions."  *Imatinib (Oral Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/imatinib-oral-route/description/drg-20068331 (last visited Feb. 4, 2020).

[15] Prilosec (omeprazole), "is used to treat certain conditions where there is too much acid in the stomach . . . [including] gastric and duodenal ulcers, erosive esophagitis, and gastroesophageal reflux disease (GERD)."  *Omeprazole (Oral Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/omeprazole-oral-route/description/drg-20066836 (last visited Feb. 4, 2020).

marijuana, but Dr. Asif explained that he was not registered with the state yet to provide medical marijuana, and prescribed Marinol[16] instead.  (*Id.* at 352.)

On March 12, 2015, Plaintiff was examined by Dr. Muhammad Naeem for complaints of "burning" abdominal pain that "worse[ned] after meals."  (*Id.* at 276.)  Dr. Naeem diagnosed Plaintiff with GERD[17] and impotence/psychosexual dysfunction.  (*Id.*)  At this time, it was recorded that Plaintiff's medications were omeprazole, Prilosec, Albuterol,[18] and Creon.[19]  (*Id.*)  (*Id.*)  Dr. Naeem wrote another prescription for omeprazole and referred Plaintiff to a hematologist for anemia assessment.  (*Id.*)

On April 21, 2015 Plaintiff attended a follow-up appointment with Dr. Yunus, reporting bloating and nausea.  (*Id.* at 278.)  Dr. Yunus noted that Plaintiff had a "patchy rash" on the lower half of his face with "3 to 5 lesions."  (*Id.*)  In addition to his other medications, Plaintiff reported taking Benadryl.  (*Id.*)  Dr. Yunus continued to diagnose Plaintiff with GERD and impotence, and also diagnosed Plaintiff with tinea capitis.[20]  (*Id.*)  Dr. Yunus noted that

---

[16] Marinol (dronabinol) is "used to prevent or treat nausea and vomiting that may occur after treatment with cancer medicines."  *Dronabinol (Oral Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/dronabinol-oral-route/description/drg-20063560 (last visited Feb. 4, 2020).

[17] *See supra*, at n.14.

[18] "Albuterol is used to treat or prevent bronchospasm in patients with asthma, bronchitis, emphysema, and other lung diseases."  *Albuterol (Inhalation Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/albuterol-inhalation-route/description/drg-20073536 (last visited Feb. 4, 2020).

[19] Creon (pancrelipase) is used to "improve food digestion" in patients with symptoms of pancreatitis.  *Pancrelipase (Oral Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/pancrelipase-oral-route/description/drg-20065293 (last visited Feb. 4, 2020).

[20] Tinea capitis, or ringworm of the scalp, is "a fungal infection of the scalp and hair shafts."  *Ringworm (scalp),* MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/ringworm-scalp/symptoms-causes/syc-20354918 (last visited Mar. 13, 2020).

Plaintiff's appearance was normal and that his abdomen was soft with no masses or tenderness. (*Id.*)

### b.     Evidence During the Relevant Period

### i.     Treatment Notes

On May 28, 2015, Plaintiff was examined by Dr. Asma Naeem for complaints of fatigue. (*Id.* at 274.) Plaintiff reported his current medications as Gleevec, Benadryl, omeprazole, Prilosec, Albuterol, and Creon. (*Id.*) Plaintiff also reported that he "want[ed] to do the pa[p]er work for [] disability." (*Id.*) The notes of Plaintiff's physical exam indicate that there were no abnormalities in Plaintiff's appearance and no masses or tenderness in his abdomen, and that Plaintiff was alert, awake and oriented. (*Id.*) Dr. Naeem listed Plaintiff's then-current diagnoses as tinea capitis, GERD, and impotence/psychosexual dysfunction. (*Id.*)

On June 30, 2015, Plaintiff was seen by Dr. Asif for a check-up. Dr. Asif noted that Plaintiff was experiencing abdominal pain, diarrhea, and nausea, although Marinol was reportedly helping with his abdominal pain. (*Id.* at 347.) Dr. Asif also noted that Plaintiff was experiencing anxiety and depression as well as sexual dysfunction. (*Id.*) Dr. Asif indicated that Plaintiff continued to take omeprazole, Gleevac, Marinol, ergocalciferol and diphenhydramine. (*Id.* at 348-49.) On January 14, 2016, Plaintiff followed up with Dr. Asif, who, at that time, noted mostly normal findings. Plaintiff requested that his Marinol dosage be increased to assist with the side effects of Gleevac, and Dr. Asif approved the increase. (*Id.* at 349.)

On March 1, 2016, Plaintiff again followed up with Dr. Asif, who noted that Plaintiff reported fatigue and nausea purportedly caused by his Gleevac prescription. Plaintiff reported that his increased Marinol dosage helped with these symptoms. (*Id.* at 365.) Dr. Asif also noted that Plaintiff reported no abdominal pain, nausea, or diarrhea, and no depression or anxiety. (*Id.*)

Similar findings were reported by Dr. Asif upon another visit by Plaintiff on July 7, 2016; at that

appointment, Dr. Asif noted that Plaintiff had been in complete remission for three years, but

recommended that he continue Gleevec for another two years, and also continue taking Marinol.

(*Id.* at 361.)

On July 20, 2016, Plaintiff underwent another CT scan on the recommendation of

Dr. Asif.  (*Id.* at 334.)  The findings of the CT scan were mostly normal, with mild hepatomegaly

and no evidence of a recurrent tumor.  (*Id.* at 335.)

On February 3, 2017, Plaintiff attended a follow-up appointment with Dr. Yunus, who

noted that Plaintiff reported pain in his left shoulder.  (*Id.*at 380.)  It was noted at this visit that

Plaintiff was taking a number of new medications, including acidophilus,[21] Flagyl,[22] Bactrim,[23]

Levaquin,[24] Lotrisone,[25] and Clindamycin,[26] in addition to his ongoing prescriptions for Creon,

---

[21] Acidophilus is used as a probiotic.  *Acidophilus,* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements-acidophilus/art-20361967 (last visited Feb. 4, 2020).

[22] Flagyl (metronidazole) is used to treat bacterial infections.  *Metronidazole (Oral Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/metronidazole-oral-route/description/drg-20064745 (last visited Feb. 4, 2020).

[23] Bactrim (sulfamethoxazole/Trimethoprim) is an antibiotic used to treat urinary tract infections and certain kinds of diarrhea.  *Sulfamethoxazole/Trimethoprim (Oral Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/sulfamethoxazole-trimethoprim-oral-route/description/drg-20071899 (last visited Feb. 4, 2020).

[24] Levaquin (levofloxacin) is an antibiotic.  *Levofloxacin (Oral Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/levofloxacin-oral-route/description/drg-20064518 (last visited Feb. 4, 2020).

[25] Lotrisone (betamethasone and clotrimazole) is used to treat fungus infections. *Betamethasone And Clotrimazole (Topical Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/betamethasone-and-clotrimazole-topical-route/description/drg-20061704 (last visited Feb. 4, 2020).

[26] Clindamycin is used to treat bacterial infections in patients who have had an allergic reaction to penicillin.  *Clindamycin (Oral Route),* MAYO CLINIC,

omeprazole, Gleevac, Prilosec, and Albuterol. (*Id.*) Dr. Yunus noted that Plaintiff had a

shoulder strain and administered a Depo-Medrol[27] injection. (*Id.* at 381.) Dr. Yusuf also

referred Plaintiff for a psychiatric assessment for post-traumatic stress disorder. (*Id.*)

On March 13, 2017, Plaintiff followed-up with Dr. Asif. (*Id.* at 420.) Dr. Asif noted a

continued diagnosis of GERD and chemotherapy-induced nausea and vomiting, although, at this

visit, Plaintiff denied symptoms of nausea, diarrhea, or vomiting, and also denied depression or

anxiety. (*Id.* at 422.) Dr. Asif recommended another CAT scan, and decreased Plaintiff's

Marinol dosage, over Plaintiff's objection. (*Id.* at 423.)

### ii. Opinion Evidence Relating to Plaintiff's Physical Impairments

Primarily with respect to Plaintiff's physical conditions, the Record also contains opinion

evidence – including letters, a functional report, and completed questionnaires – from certain of

his medical providers.

First, in an undated letter, Dr. Asma Naeem stated that Plaintiff had been her patient "for

some time," and that he suffered from "chronic pancreatitis,"[28] "multiple new complaints

involving his gastric sym[pt]oms," and "extreme pain" that "ma[de] it very hard for [him] to

complete every day activities." (*Id.* at 272. She also stated that Plaintiff had "expressed to [her]

---

https://www.mayoclinic.org/drugs-supplements/clindamycin-oral-route/description/drg-20110243 (last visited Feb. 4, 2020).

[27] Depo-Medrol (methylprednisolone) is an injection used to provide relief for inflammation and swelling, as well as allergic reactions. *Methylprednisolone,* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/methylprednisolone-injection-route/description/drg-20075216 (last visited Feb. 4, 2020).

[28] Pancreatitis is inflammation in the pancreas. *Pancreatitis,* MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/pancreatitis/symptoms-causes/syc-20360227 (last visited Feb. 4, 2020).

that he ha[d] to take part in a 3x weekly anger management class" (*id*.), and she opined that, "given [Plaintiff'] health condition[,] [] he should try to eliminate stren[u]ous activity, or anything that might upset his condition to perhaps, 1x weekly." (*Id*.)

Second, on June 30, 2015, Dr. Asif completed a form report regarding Plaintiff's physical conditions and functional limitations. (*Id*. at 304-10.) In that report, Dr. Asif identified Plaintiff's then-current symptoms as "chronic abdominal pain, anorexia, [and] nausea." (*Id*. at 304.) Dr. Asif noted that Plaintiff had a history of a tumor in his abdomen/small intestine, for which he had undergone surgery in March 2013 and was taking Gleevec, as chemotherapy – the adverse effects of which included fatigue, fluid retention, anorexia, and nausea. (*Id*. at 307.) He further noted that Plaintiff had complained of "steady," "dull, nagging" pain in his abdomen, for which he had been prescribed Marinol.[29] (*Id*. at 308.) He also noted that Plaintiff's pain resulted in an "inability to walk long distance[s]" (*id*. at 309), although he also indicated that Plaintiff's muscle strength and tone were normal (*id*. at 305), and that he did not require an assistive device to walk (*id*.). With respect to Plaintiff's particular functional limitations, Dr. Asif reported that Plaintiff could lift and carry "occasionally" (although he did not specify what weight) and could sit without limitations. (*Id*. at 309.) Somewhat confusingly, he checked both that Plaintiff could stand or walk for up to two hours per day, and that he could only stand and/or walk for less than two hours per day. (*Id*.) Dr. Asif also asserted that Plaintiff had some limitation in pushing and/or pulling with his upper extremities, but did not describe the limitation. (*Id*.) As for any indicia of a psychiatric condition, Dr. Asif indicated that Plaintiff had not displayed any behavior

---

[29] Later, on September 3, 2015, Dr. Asif wrote a letter stating that Plaintiff was under his care for a GIST and had been prescribed Marinol, which could result in positive THC levels in patients. (*Id*. at 346.) The Court notes that "THC is the primary ingredient in marijuana that makes people 'high.'" Medical Marijuana, MAYO CLINIC, https://www.mayoclinic.org/healthy-lifestyle/consumer-health/in-depth/medical-marijuana/art-20137855 (last visited Mar. 10, 2020).

suggestive of a significant psychiatric disorder (*id*. at 304), and further indicated that there were no notable abnormalities in Plaintiff's mental status (*id*. at 306).

Third, on August 21, 2015, Dr. Yunus wrote a very short letter, in which he asserted that Plaintiff had been diagnosed with a GIST and was undergoing chemotherapy. (*Id*. at 316.) Without further explanation, Dr. Yunus also wrote that Plaintiff was "unable to work regular hours on a consistent basis." (*Id*.)

Fourth, in or about October of 2015,[30] Dr. Yunus completed a "Disability Impairment Questionnaire," in which he noted Plaintiff's diagnoses of a GIST and chronic pancreatitis. (*Id*. at 323.) Dr. Yunus stated that Plaintiff's primary symptoms included indigestion, food intolerance, and abdominal pain, and that those symptoms were aggravated by food and chemotherapy. (*Id*. at 324.) In contrast to any suggestion in Dr. Asif's June 2015 report that Plaintiff was limited to standing or walking for only two hours (or less) in an eight-hour workday, Dr. Yunus opined that Plaintiff could perform work in a seated position, or standing and/or walking, for six or more hours per day, and further noted that it was not necessary for Plaintiff to avoid continuous sitting during an eight-hour workday. (*Id*.) Dr. Yunus also opined that Plaintiff could lift and carry over 50 pounds frequently, and could also frequently grasp, turn, and twist objects, use his hands/fingers for fine manipulation, and use his arms for reaching. (*Id*. at 325-26.) Dr. Yunus stated that Plaintiff's symptoms would likely increase if placed in a competitive work environment, as he had "intermittent exacerbations" (*id*. at 326), but he indicated that Plaintiff's pain would "rarely" interfere with his attention and concentration (*id*.). With regard to Plaintiff's potential need for breaks during the workday, Dr. Yunus indicated that

---

[30] The date on which this document was signed by Dr. Yunus is illegible, but it appears to have been faxed to Dr. Yunus on September 30, 2015, and returned by Dr. Yunus on October 5, 2015. (*See id*. at 323.)

Plaintiff would need to take unscheduled breaks to rest at unpredictable intervals during the day, but, when asked on the form how often such breaks would be needed, he somewhat confusingly answered "once a month," for, on average, "2 days." (*Id*. at 326.) When separately asked, though, how often, on average, Plaintiff would "likely be absent from work as a result of [] his impairments or treatment," Dr. Yunis responded "[l]ess than once a month" (*id.* at 327). Dr. Yunus estimated that that the symptoms he described, and the related limitations, had been present as far back as January 1, 2013. (*Id.*) As for any psychiatric issues, Dr. Yunus indicated that emotional factors did not contribute to the severity of Plaintiff's symptoms and functional limitations, as assessed. (*Id*.)

Finally, on January 18, 2017, Dr. Asif completed a Cancer Impairment Questionnaire provided by Plaintiff's counsel. (*Id.* at 372-78.) Dr. Asif noted that Plaintiff had been diagnosed with an unmetastasized GIST tumor, which had been treated with surgery and chemotherapy. (*Id.* at 372-73.) He noted that Plaintiff continued to take Gleevac and Marinol, although he also noted that Plaintiff's prescription for Gleevac might be discontinued, due to the length of time that had passed since his surgery. (*Id.* at 374.) He reported that Plaintiff had occasionally experienced nausea, but that he was no longer experiencing this, and had not experienced side effects for more than 12 months. (*Id*.) He reported that Plaintiff had "no pain" and that his cancer had been in complete remission for over three years. (*Id.* at 375.) With respect to Plaintiff's functional limitations, Dr. Asif opined that Plaintiff could perform a job seated, standing, and/or walking for six or more hours each day, and that he did not need to avoid continuous sitting. (*Id.* at 376.) Dr. Asif further opined that Plaintiff could carry 10-20 pounds "occasionally," and that Plaintiff had "no limitations" with regard to reaching, handling, or fingering. (*Id.* at 377.) Dr. Asif also stated that Plaintiff's symptoms would not be likely to

increase if he were placed in a competitive work environment, that he would not need to take

unscheduled breaks during an eight-hour workday, and that he would likely be absent from work

less than once a month.  (*Id.* at 377-78.)  Dr. Asif indicated that Plaintiff's pain would "rarely"

interfere with his attention and concentration and that emotional factors did not contribute to the

severity of Plaintiff's symptoms.  (*Id.*)

### 2.  Evidence of Mental Impairments

The Record does not contain any medical evidence of Plaintiff's having received

psychiatric treatment for any mental impairments prior to the relevant period.  (*See generally* R.)

The Court does note, however, that, at various points, the treatment notes referenced above, from

the physicians who treated Plaintiff for his physical impairments throughout 2014 and into 2015,

include at least cursory mental status exams, which generally resulted in normal findings.  (*See

id.* at 276 (findings that Plaintiff was awake, alert, and oriented times three (*i.e.*, oriented to

person, place, and time)), 278 (same), 366 (noting during a physical exam that Plaintiff exhibited

"insight:  good judgment").)  The actual psychiatric treatment records that exist in the Record

cover only a short period of time at the end of 2015, and a second period in 2017.

### a.  Plaintiff's 2015 Treatment at
### Bronxville Psychiatric Wellness Group

The first record reflecting Plaintiff's psychiatric treatment relates to his December 2,

2015 visit to the Bronxville Psychiatric Wellness Group, P.C. ("BPWG"), where he was

apparently evaluated by Dr. Zeena Marshall.[31]  Plaintiff reported feeling depressed, anxious, and

---

[31] The Court notes that the records of Plaintiff's visits to BPWG do not actually show a
name or signature of any particular provider.  (*See id.* at 328-30.)  At the Hearing, however,
Plaintiff testified that he had attended a few appointments with "Dr. Marshall" for mental health
treatment before his insurance coverage ended (*id.* at 63-64), and the website for BPWG lists
Dr. Marshall as its sole staff member, *see* Bronxville Psychiatric Wellness Group,
https://bronxvillepsychiatricwellnessgroup.com/ (last visited Jan. 10, 2020).  Plaintiff also

lonely, with insomnia, poor appetite, and poor concentration. (*Id.* at 328.) Plaintiff also reported

racing thoughts, mood swings, delusions, and hallucinations, stating that he "always [saw]

shadows and . . . always hear[d] [his] voice." (*Id.*) He stated that he felt "suspicious of others"

and that he experienced anxiety attacks "every other day," with sweating, chest pain, dizziness,

nausea, and fear of losing control. (*Id.*) He also reported that he felt that "the correction officers

were poisoning him in jail," purportedly because they "did not like him because they were all

white." (*Id.*) He stated that he had previously seen a psychiatrist who prescribed him Seroquel,

but that he stopped taking it because he "did not like it" and thought it made him "stupid." (*Id.*)

Dr. Marshall noted that Plaintiff was undergoing chemotherapy, which Plaintiff apparently

reported would continue "for the rest of his life." (*Id.*)[32]

With respect to Plaintiff's mental status exam, Dr. Marshall found that Plaintiff was

appropriate in appearance, and was alert and oriented. (*Id.* at 328.) Despite Plaintiff's seeming

reports to the contrary, she also noted that he was sleeping well, had a good appetite, and had

intact memory and concentration. (*See id.*) She did find, however, that Plaintiff was "paranoid"

and that his mood was "anxious and depressed." (*Id.*) Dr. Marshall rated Plaintiff's cognitive

function at six (on a 10-point scale). (*Id.* at 329.) She diagnosed Plaintiff with moderate

---

reported in 2017 that he had previously worked with Dr. Marshall. (*Id.* at 399.) The Court also notes that the ALJ appears to have assumed that the treatment notes from December 2015 were created by Dr. Marshall. (*Id.* at 20.)

[32] Plaintiff's report, in this regard, seems to be at odds with the records of his physical health providers (*see* Background, *supra*, at Section B(1)), who noted on multiple occasions that an end date would be set for his chemotherapy medication.

Bipolar I Disorder and Post-Traumatic Stress Disorder with delayed expression, and prescribed Geodon[33] and Cogentin.[34]  (*Id.* at 329.)

On December 21, 2015, Plaintiff attended a follow-up appointment with Dr. Marshall.[35] Plaintiff reported that he was "not doing too well," as his mood "ha[d] been up and down."  (*Id.* at 330.)  Plaintiff denied side effects from his medication.  (*Id.*)  His mental status exam contained findings similar to those found on the prior exam, although the content of his speech was no longer noted to be paranoid, and was instead noted as "unremarkable."  (*Id.*) Dr. Marshall indicated that Plaintiff's mood was euthymic[36] and "less anxious," and increased his dosage of Geodon.  (*Id.*)[37]

### b.    Plaintiff's 2017 Treatment at Andrus Mental Health Services

It appears from the Record that, after his December 2015 appointment with Dr. Marshall, Plaintiff did not receive psychiatric treatment for over a year.  (*See id.* at 63-64 (Plaintiff noting that he stopped seeing Dr. Marshall because his "insurance dropped" and "in the interim [he]

---

[33] Geodon (ziprasidone), is used to treat symptoms of psychotic mental disorders, such as schizophrenia or bipolar disorder.  *Ziprasidone,* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/ziprasidone-oral-route/description/drg-20067144 (last visited Jan. 22, 2020).

[34] Cogentin (benztropine), improves muscle control and reduces stiffness, and is used to treat Parkinson's disease as well as to control severe reactions to certain medicines used to treat mental and emotional conditions.  *Benztropine,* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/benztropine-oral-route/description/drg-20072652 (last visited Jan. 22, 2020).

[35] *See* n.31, *supra.*

[36] Euthymia is defined as, *inter alia,* "[m]oderation of mood, not manic or depressed." STEDMAN'S MEDICAL DICTIONARY 307600 (Westlaw 2014).

[37] It appears that Plaintiff stopped taking these medications at some point, as he testified at the Hearing that he was not on any medications for his psychiatric symptoms.  (*Id.* at 82-83.)

didn't even go around looking for another doctor").)  On March 21, 2017, however, Plaintiff was given an intake assessment by Dr. Stephen Scherer, Post-Doctoral Fellow, and Dr. Jonathan Cohen, Supervising Clinical Psychologist, at Andrus Mental Health Services Clinic ("Andrus") in White Plains, New York.  (*Id.* at 390, 399-409.)  At that time, Plaintiff reported experiencing nightmares and flashbacks, as well as anxiety around others and in closed spaces.  (*Id.* at 399.) Plaintiff reported taking Marinol, Benadryl, and Afrin.[38]  (*Id.* at 400.)  Plaintiff also noted that he lived with his mother and cared for her and her house.  (*Id.* at 402.)  He reported that, although he had only had his job (presumably referring to his probationary position as an Operations Aide for the Promesa methadone treatment program)[39] for less than six months, he was employed "part time" and was satisfied with his job.  (*Id.*)  He also reported that he had spent 28 years[40] in "various prisons," although he did not provide the reasons for his incarceration.  (*Id.* at 403.)

Plaintiff's mental status evaluation produced largely normal findings, although Dr. Scherer noted that Plaintiff's attitude, while "cooperative," was "guarded," that his dominant mood was "anxious," and that his affect was both "tense" and "engaging."  (*Id.* at 404-05.)  He also recorded that Plaintiff only made "intermittent" eye contact.  (*Id.* at 404.)  Dr. Scherer stated

---

[38] Afrin (oxymetazoline) is a decongestant, and is available without a prescription. *Oxymetazoline (Nasal Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/oxymetazoline-nasal-route/description/drg-20067830 (last visited Feb. 4, 2020).

[39] In his notes of this visit, Dr. Scherer only characterized Plaintiff's work at Promesa as an "internship."  (*Id.* at 403.)  It appears, however, that Plaintiff commenced treatment with Dr. Scherer specifically because he was given instruction by a superior at Promesa to see a mental health professional (*see id.* at 57 (Plaintiff testifying at the Hearing that the impetus for his starting treatment with Dr. Scherer was that his co-workers had made complaints about him, and he was told that he "needed to talk to somebody about the job situation")), and thus it seems likely that the "job" Plaintiff was referencing in his appointment with Dr. Scherer was job at Promesa.

[40] *See* n.5, *supra.*

18

that Plaintiff's thought process was "coherent," but "thought[-]blocking."  (*Id.* at 405.)  He noted

that Plaintiff's ability to concentrate was impaired, but that he was fully oriented, and that his

memory, insight, and judgment were all "good."  (*Id.* at 405-06.)  Dr. Scherer found no

indication of any delusions or hallucinations.  (*Id.*)  Overall, Dr. Scherer noted that Plaintiff's

symptoms were "characteristic of a diagnosis of PTSD."  (*Id.* at 409.)

In later treatment notes, from May 2017, Dr. Scherer noted that Plaintiff reported

nightmares, insomnia, panic, hypervigilance, and nervousness in closed spaces, as well as

avoidant behaviors and irritability.  (*Id.* at 397.)  He further noted that these symptoms occurred

on an "intermittent basis" and affected Plaintiff's education and work, as well as Plaintiff's

social and familial relationships, though he did not elaborate on how they affected Plaintiff's

daily life or to what extent.  (*Id.* at 397.)

> ### c.     Opinion Evidence Relating to Plaintiff's
> ### Mental Impairments:  July 2017 Mental
> ### Impairment Questionnaire (Dr. Scherer)

On July 17, 2017, Dr. Scherer completed a Mental Impairment Questionnaire, reporting

that Plaintiff had been diagnosed with PTSD, with symptoms of, *inter alia*, depression and

anxiety, hostility or irritability, feelings of guilt or worthlessness, difficulty thinking or

concentrating, easy distractibility, paranoia, panic attacks, intrusive recollections of a traumatic

experience, persistent irrational fears, vigilance and scanning, appetite disturbances/weight

change, and insomnia.  (*Id.* at 392-93.)  Dr. Scherer noted that Plaintiff had "moderate"

limitations in performing at a consistent pace and accepting instruction and criticism from

supervisors; "moderate-to-marked" limitations in sustaining an ordinary routine, working with or

near others without distractions, completing a workday without interruptions, and maintaining

socially appropriate behavior; and "marked" limitations in interacting appropriately with the public.  (*Id.* at 395.)

### 3.     Plaintiff's Reports Regarding His Limitations

Plaintiff filed his application for SSI disability benefits (Form OMB No. 0960-0579) on April 24, 2015, alleging, as noted above, disabilities of stage 3 cancer and a "GIST tumor resection."  (*Id.,* at 187, 208.)  Plaintiff reported that he had ceased work as an actor on March 31, 2015, for "non-disability related" reasons.  Despite this, Plaintiff asserted that his impairments became severe enough to keep him from working as of August 1, 2012.  (*Id.*)

On May 5, 2015, Plaintiff completed a "Function Report," in which he described his then-current impairments and abilities.  (*Id.* at 217-27.)  In that report, Plaintiff stated that he lived with his mother.  (*Id.* at 217.)  Plaintiff reported problems with dressing and bathing, stating that there were days when he never left his bed, and that he had some "balance issues" with bathing.  (*Id.* at 218.)  Plaintiff also reported, though, that he would go to the store for food and clothes, and that he was able to clean and to do laundry.  (*Id.* at 220-21.)  He further stated that he prepared his own food or meals (specifically, frozen meals) on a daily basis, even though he "c[ouldn]'t eat well."  (*Id.* at 219, 221.)

With respect to his ability to concentrate, Plaintiff stated that he sometimes forgot to take his medications and would need reminders.  (*Id.* at 219.)  He also reported problems with paying attention, and stated that he could not finish tasks once started because he was "very h[y]per." (*Id.* at 224.)  He also stated that stress or changes in his schedule made him "very anxious," and that he could "only deal with one thing at a time."  (*Id.* at 225.)  He stated that he was unable to pay bills, but that he could count change and handle a savings account.  (*Id.* at 221.)

Plaintiff indicated that, when he went out, he would walk, ride in a car, or use public transportation. (*Id.* at 220.) He reported watching TV and listening to music "everyday." (*Id.*) With respect to social activities, Plaintiff stated that he spent time with others talking about "everyday" things, although he "[didn't] have many friends or family." (*Id.* at 222.) He also reported that he did not have problems getting along with family, friends, neighbors, or others. (*Id.*) He also reported no problems in getting along with authority figures. (*Id.* at 224.)

With respect to Plaintiff's physical limitations, he stated that he was not able to lift "heavy" items, that he had "no problem" standing "for short periods," that his walking was slow most of the time, and that he could only walk for approximately five minutes before he needed to rest. (*Id.* at 222, 224.) He reported that he wore glasses, but had "no problem" sitting, climbing stairs, kneeling, squatting, reaching, using his hands, hearing, or talking. (*Id.* at 223.) Plaintiff also described pain related to his intestinal tumor as a "stabbing ache . . . next to my pancreas" (*id.,* at 225), and he indicated that he experienced that pain daily, usually after eating (*id.* at 226). He reported taking "Klevec" (presumably Gleevec) and "medical marijuana pills" (presumably referring to Marinol) for the pain, and that the marijuana helped but did not totally abate the pain. (*Id.*)

On May 30, 2015, Plaintiff apparently completed another "Function Report." (*Id.* at 284-93.) The information given by Plaintiff in this later Function Report is substantially similar to that which he provided in the earlier Function Report, with a few notable differences. In particular, in the May 30 report, Plaintiff denied any problems with dressing or bathing, but stated, without explanation, that his disabilities interfered with his ability to feed himself and use the toilet. (*Id.* at 285.) Plaintiff continued to maintain, however, that he prepared his own meals of frozen food or eggs on a daily basis. (*Id.* at 285-86.) Plaintiff also reported that he would go

outside three to four times a week, and that he also engaged in reading as a hobby. (*Id.* at 286-87.) Plaintiff explained that he had been diagnosed with PTSD and would lose concentration quickly. (*Id.* at 287-88.) He also stated he had "attention deficit." (*Id.* at 290.) Plaintiff's reports regarding his physical limitations and pain were largely the same as they had been previously, except that Plaintiff also noted that he would get tired if he used stairs, and that he "d[id]n't like to talk too much" because he would "get anxious." (*Id.* at 288-89.) He also noted that the pain in his abdomen that he had previously reported would occasionally radiate to his back, hands, and legs. (*Id.* at 291-92.)

It appears that, at some point, Plaintiff also filled out portions of a Work History Report (SSA Form 0960-0578). Although Plaintiff reported no work history, and much of the form is simply filled with the repeated notation "N/A," Plaintiff did mark, in three places, that the heaviest weight he had lifted was 20 pounds, which he had lifted frequently. (*Id.* at 297, 299, 301.)

C.     <u>Plaintiff's Testimony Before the ALJ</u>

On July 28, 2017, Plaintiff testified at the Hearing before the ALJ, represented by Stephen Ekblom, Esq.,[41] of the law firm of Binder & Binder. (*Id.* at 44-46.)[42] Plaintiff testified that he was then 53 years old, and that he had attended one year of college in 2015. (*Id.* at 50.)

_____

[41] Although the transcript of the hearing transcribes the name of Plaintiff's counsel as "Stephen Englund," the Court presumes, based on numerous submissions from Mr. Ekblom to the ALJ, that the transcription was an error.

[42] At the outset of the Hearing, the ALJ noted that Plaintiff's counsel had alerted her to the fact that counsel was still awaiting receipt of certain records, and the ALJ inquired as to what attempts had been made by Plaintiff and his counsel to obtain those records. Plaintiff's counsel explained that a Dr. "Steve" was refusing to send records, and that a Dr. "Munoz" had been nonresponsive to counsel's requests. (*Id.* at 47-48.) As there are no medical providers with these names in the Record, these may have been transcription errors, potentially referring to Dr. "Asif" and Dr. "Yunus."

He explained that he had worked as an Operations Aide for a methadone program at Promesa for four months, until his termination in May 2017.  (*Id.* at 50-53.)  He also testified that, at the time of the Hearing, he was holding training classes at a gym for approximately one hour, two to three times per week.  (*Id.* at 53.)  He testified that he made from $35 to $150 a week, depending on how many classes he taught that week.  (*Id.* at 53-54.)  Plaintiff reported feeling suspicious of attendees at his training classes who would stand behind him or ask about his schedule.  (*Id.* at 53-56.)

Plaintiff testified that he had first treated for his psychiatric impairments with Dr. Marshall, but had stopped treating with her after he lost his insurance.  (*Id.* at 63.)  Plaintiff testified that, as of the time of the Hearing, he had been treated by Dr. Scherer for "a few months" and that he had started that treatment in connection with his employment as an Operations Aide.  (*Id.* at 56-57.)  Plaintiff testified at length regarding his limitations in interacting with others, describing, in particular, the tensions that had existed between him and his co-workers at Promesa.  (*See id.* at 57-61, 65-66, 71.)  He reported that his co-workers had complained that he was "aggressive" and "paranoid," and explained that he had been "bothered" and "scared" by his co-workers' approaching him from behind and being able to read his computer screen.  (*Id.* at 57, 59-60.)  Plaintiff also testified that he was uncomfortable in public because he felt that he was being watched by others, and that he would get agitated in crowded spaces such as restaurants.  (*Id.* at 67-73.)  Plaintiff claimed that these symptoms were due in part to his having spent time in prison, where he had consistently been concerned about being attacked by other inmates.  (*Id.* at 61-63.)  Plaintiff also testified, however, that he had attended church for a few months and was "treated like a human" there, even though he felt "out of place" because he did not have a family and was attending alone.  (*Id.* at 85.)

With respect to his concentration, Plaintiff testified that he "couldn't focus or wait [un]til the next day to do homework" when he attended college classes and that he would sometimes forget where he placed his wallet or keys. (*Id.* at 72.) He also testified that he didn't "have the attention span" to read. (*Id.* at 84.)

With respect to his physical impairments, Plaintiff testified that he had ceased chemotherapy approximately two months prior to the Hearing, but that he was still experiencing certain side effects, including diarrhea and fatigue. (*Id.* at 75-76.) He reported that he would feel "stuck" in the house due to these symptoms and would stay inside at home all day approximately two to three times per week. (*Id.* at 77.) Plaintiff also testified, however, that he helped his mother monitor her health, clean the house, and make repairs. (*Id.* at 79.) He testified that, when he was first released from prison, he would help his mother shop for groceries, but that, after a time, he stopped because of the crowds and long lines. (*Id.* at 80.)

Plaintiff reported that he was currently taking Prilosec and Marinol, but that he anticipated that he would stop taking Marinol within a few weeks, due to the conclusion of his chemotherapy. (*Id.* at 82.) He denied taking any psychiatric medications and stated that he did not want to take such medications because he had "seen what that does to people." (*Id.* at 82.) He confirmed that Dr. Scherer had not recommended any medications for his alleged mental impairments. (*Id.* at 83.)

At the conclusion of the hearing, following the testimony of a Vocational Expert ("VE"), Plaintiff asserted that he wanted to know why Dr. "Rose" and Dr. "Unis"[43] had stated that Plaintiff was able to "work for six hours a day," as he claimed those doctors only saw him when

---

[43] The Court assumes that "Unis" is a typographical error for Dr. Yunus. (*Id.*) There are no notes or reports in the Record, though, from a provider or medical consultant named (or whose name sounds like) Dr. "Rose." (*See generally id.*)

he was able to get to the hospital, but not when he "[couldn't] move."  (*Id.* at 93-94.)  The ALJ

assured Plaintiff that she would look at the "whole picture" in reaching her determination.  (*Id.*

at 94.)

        **D.**       **The VE's Testimony Before the ALJ**

       The ALJ also heard testimony from a VE, identified in the Record only as "Ms. Russo."

(*See id*. at 87-93.)  The ALJ first asked the VE if an individual of the same age, education and

past work experience as Plaintiff, with Plaintiff's RFC (as ultimately determined by the ALJ in

her decision (*see* Discussion, *infra*, at Section III(B))), could perform any of Plaintiff's identified

past work (R. at 87-88).  The VE responded that Plaintiff's past work would be precluded

because it was "over the exertional level" and involved contact with the public.  (*Id.* at 88.)  The

ALJ then inquired whether there were other jobs in the economy that such an individual could

perform, and the VE responded that such an individual could perform the jobs of a marker,

cleaner/housekeeper, and garment sorter.  (*Id.*)  The ALJ then inquired as to whether a person

with the same limitations, who would also be off-task for more than 15 percent of the workday,

would be able to perform any past work or jobs in the national economy, and the VE responded

that work would be precluded for such an individual.  (*Id.*)  In response to questioning from

Plaintiff's counsel, the VE further explained that an unskilled worker typically could not be off

task for more than nine percent of the workday.  (*Id.* at 89.)

        **E.**       **Evidence Submitted to the Appeals Council**

       After ALJ Singh issued a decision adverse to Plaintiff, Plaintiff appealed that decision to

the Appeals Council, and, in connection with his appeal, Plaintiff submitted additional medical

records, including treatment records from Advanced Urology Centers of New York ("Advanced

Urology") and new records from Drs. Muhammad Naeem, Asma Naeem, and Scherer.  (*See id.*

at 2.)  That evidence reflected that Plaintiff underwent an echocardiogram ("ECG") at an

appointment with Dr. Asma Naeem on October 24, 2016. (*Id.* at 37.) It also showed that, on

December 21, 2016, and January 26, 2017, Plaintiff attended appointments with Dr. Carl Gerardi

of Advanced Urology, who diagnosed Plaintiff with testicular hypofunction. (*Id.* at 35, 39.) The

evidence also contained updated notes from Dr. Scherer, who noted in September 2017 that

Plaintiff's "symptom presentation [had] not changed since intake" and that he "continue[d] to

experience nightmares, insomnia, panic symptoms, hypervigilance, anxiety in closed spaces,

avoid[ance] [of] triggering situations and people, and irritability." (*Id.* at 41.)

The Appeals Council concluded that this additional evidence "d[id] not show a

reasonable probability that it would change the outcome of the [ALJ's] decision." (*Id.* at 2.)

**F.  The Current Action and Motions Before the Court**

Plaintiff, proceeding *pro se,* commenced this action by filing a Complaint with the Court

on October 23, 2018. (Dkt. 2.) In his Complaint, Plaintiff asserted generally that the ALJ's

decision was "not supported by substantial evidence . . . or was based on legal error." (*Id.*)

Plaintiff requested that the Court "modify or reverse the decision of the [Commissioner]" and

award him SSI benefits. (*Id.*) During the pendency of this action, Plaintiff also submitted

several letters to the Court which purported to provide, for the Court's consideration, additional

information and medical records regarding Plaintiff's impairments. (*See* Dkts. 9-12, 19-20.)[44]

While some of those letters attached updated reports from Dr. Scherer, which appear to report

some worsening of Plaintiff's PTSD-related symptoms, the updated reports do not add any

---

[44] The Court notes that one of Plaintiff's letters (Dkt. 11) asserted that the Commissioner
had been untimely in filing the Record, which Plaintiff apparently believed had been due within
60 days of an Order of Service and Scheduling Order issued by the Hon. Ronnie Abrams,
U.S.D.J. (Dkt. 6.) The Order, however, directed the Commissioner to file the Record within 90
days, not 60. (*Id.*) Thus, to the extent Plaintiff's letter sought any relief or sanction against
Defendant based on the alleged untimeliness of the filing of the Record, that request is denied.

additional or clarifying information regarding Dr. Scherer's earlier reports, which related to the relevant time period.  (*See generally id.*)

On February 20, 2019, the Commissioner filed a motion for judgment on the pleadings (Dkt. 16), together with a supporting memorandum of law (Memorandum of Law in Support of Defendant's Cross Motion for Judgment on the Pleadings, dated Feb. 20, 2019 ("Def. Mem.") (Dkt. 17).)  In that motion, Defendant requests that the Court affirm the decision of the Commissioner, contending that the decision was based on substantial evidence and that the additional evidence submitted to the Appeals Council and to this Court by Plaintiff cannot suffice to disturb that decision.

Plaintiff filed no separate cross-motion, but, given this Court's obligation to construe *pro se* papers liberally to raise the strongest arguments they suggest, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting authority), this Court construes Plaintiff's opposition (*see* Letter from Plaintiff, dated Feb. 24, 2019 ("Pl. Opp.") (Dkt. 18)) as a cross-motion for judgment on the pleadings in his favor, pursuant to Rule 12(c), *see Camacho v. Colvin*, No. 15CV7080(CM)(DF), 2017 WL 770613, at *13 (S.D.N.Y. Feb. 27, 2017) (adopting report and recommendation).  In his opposition, Plaintiff asserts that the matter should be remanded because "the [ALJ] failed to give proper credit to the [o]pinion of the 'treating physician,' i.e., Dr. Steven Scherer."  (Pl. Opp., at ECF 1.)[45]  Plaintiff also argues that the evidence submitted after the ALJ's decision "is cumulative and critical evidence which has clearly been overlooked, and/or ignored."  (*Id.,* at ECF 2.)

---

[45] As Plaintiff's opposition does not include page numbers, the Court will refer to the page numbers affixed by the Court's Electronic Case Filing ("ECF") system.

**DISCUSSION**

## I.    APPLICABLE LEGAL STANDARDS

### A.    Judgment on the Pleadings

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied, and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making

28

this determination, a court must consider the underlying record.  The reviewing court does not,

however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578,

586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported

by evidence having rational probative force, we will not substitute our judgment for that of the

Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104

F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, this

Court must uphold the Commissioner's decision upon a finding of substantial evidence, even

where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)

("Where there is substantial evidence to support either position, the determination is one to be

made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir.

1998) (affirming decision where substantial evidence supported both sides).

> **B.**     **The Five-Step Sequential Evaluation**

To be entitled to disability benefits under the Act, a claimant must establish his or her

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered

disabled only if the individual's physical or mental impairments are of such severity that he or

she is not only unable to do his or her previous work, but also cannot, considering his or her age,

education, and work experience, engage in any other kind of substantial gainful work that exists

in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the

regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. § 416.920;

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Throughout the inquiry, the

ALJ must consider four primary sources of evidence: "(1) the objective medical facts; (2)

diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability

testified to by the claimant or others; and (4) the claimant's educational background, age, and

work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is

engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If not, at the second step,

the ALJ determines whether the claimant has a "severe" impairment or combination of

impairments that significantly limits his or her physical or mental ability to do basic work

activities. *Id.* §§ 416.920(a)(4)(ii), (c). If the claimant does suffer from such an impairment,

then the third step requires the ALJ to determine whether this impairment meets or equals an

impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.* § 416.920(a)(4)(iii). If it does, then

the claimant is presumed to be disabled "without considering [the claimant's] age, education, and

work experience." *Id.* § 416.920(d).

Where the claimant alleges a mental impairment, Steps Two and Three require the ALJ to

apply a "special technique," outlined in 20 C.F.R. § 416.920a, to determine the severity of the

claimant's impairment at Step Two, and to determine whether the impairment satisfies Social

Security regulations at Step Three.[46] *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If

the claimant is found to have a "medically determinable mental impairment," the ALJ must

---

[46] Pursuant to 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), the SSA revised the
criteria in the Listing of Impairments (the "Listing," 20 C.F.R. Pt. 404, Subpt. P, App. 1) used to
evaluate claims involving mental disorders under Titles II and XVI of the Act, effective
January 17, 2017. These revisions impacted various relevant portions of 20 C.F.R. §§ 404 and
416. This Court will review the ALJ's decision under the text of the applicable Regulation as it
existed at the time that the ALJ issued his decision, *see Brothers v. Colvin*, No. 7:16cv100
(MAD), 2017 WL 530525, at *4 n.2 (N.D.N.Y. Feb. 9, 2017).

"specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Section 416.920a]," which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.[47]  20 C.F.R. §§ 416.920a(b), (c)(3); *see Kohler*, 546 F.3d at 265-66.  The functional limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," or "four or more."  20 C.F.R. § 416.920a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's residual functional capacity, or ability to perform physical and mental work activities on a sustained basis.  *Id.* § 416.945.  The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work."  *Id.* § 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy.  *Id.* §§ 416.920(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467 (citation omitted).

_____

47 "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 n.130 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors. 20 C.F.R. § 416.960(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines (the "Grids"), set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2. Where, however, the claimant suffers from nonexertional impairments (such as mental impairments) that "'significantly limit the range of work permitted by his [or her] exertional limitations,'" the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (citations omitted)). "A nonexertional impairment 'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Id.* at 411 (quoting *Bapp*, 802 F.2d at 605-06).

### C.     The Treating Physician Rule

Under the so-called "treating physician rule,"[48] the medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20

---

48 In accordance with Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein, will no longer be in effect for applications made to the SSA on or after March 27, 2017.

C.F.R. § 416.927(c)(2). "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her. 20 C.F.R. § 416.902. Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 416.927(c)(2); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004) (summary order).

Where an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion. 20 C.F.R. § 416.927(c)(2). Failure to "give good reasons" is grounds for remand. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion . . . ."). Moreover, in determining the weight to be accorded to an opinion of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)[49]), including: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the consistency of the physician's opinion with the record as a whole;

---

[49] On February 23, 2012, the Commissioner amended 20 C.F.R. §§ 404.1527 and 416.927, by, among other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs (c) through (e).

and (5) the specialization of the physician providing the opinion, 20 C.F.R. § 416.927(c)(2)-(5); *see Shaw*, 221 F.3d at 134 (noting that these five factors "must be considered when the treating physician's opinion is not given controlling weight").

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining sources. 20 C.F.R. § 416.927(c)(2); *see* SSR 96-2p (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000). A consultative physician's opinion, by contrast, is generally entitled to "little weight." *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (Summary Order) (internal quotation marks and citation omitted). This is because consultative examinations "are often brief, are generally performed without benefit or review of the claimant's medical history, and, at best, only give a glimpse of the claimant on a single day." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citations omitted). The opinions of consultative physicians, though, "can constitute substantial evidence in support of the ALJ's decision" when the opinion of a claimant's treating physician cannot be obtained. *Sanchez v. Commissioner of Social Sec.*, No. 15cv4914, 2016 WL 8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted by* 2017 WL 979056 (Mar. 13, 2017).

### D.    Consideration of New Evidence

When, upon an administrative appeal, the claimant submits supplemental evidence that was not before the ALJ, the Appeals Council is required to consider that evidence, to the extent it "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. §

416.1476(b).  If, after considering the additional evidence, the Appeals Council denies review of the ALJ's decision, then the record before the reviewing court will then include the supplemental evidence.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).  At that point, the task of the reviewing court will be to "review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the [agency's] decision."  *Id.*

When a court is confronted with a case where the plaintiff has submitted supplemental evidence to the court itself to support his or her claim, the court may remand based on that evidence, provided the plaintiff shows good cause for the failure to have incorporated such evidence into the record previously.  42 U.S.C. § 405(g); *see also Lisa v. Secretary of Health and Human Services*, 940 F.2d 40, 43 (2d Cir. 1991); *Fortier v. Astrue*, No. 09cv0993 (RJS) (HBP), 2010 WL 1506549, at *20 (S.D.N.Y. Apr. 13, 2010) (adopting report and recommendation); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).  To justify remand, however, the court must find that the supplemental evidence is "new" – in the sense that it is not merely duplicative of evidence already in the record, *Tirado*, 842 F.2d at 597; *Harris-Batten v. Comm'r of Social Security*, No. 05cv7188, 2012 WL 414292, at *6 (S.D.N.Y. Feb. 9, 2012), and also that it is "material" – that is, relevant to the time period at issue, and probative, such that it is reasonably possible that such evidence would have influenced the Commissioner to decide the claim differently, *Tirado*, 842 F.2d at 597.

## II.    THE ALJ'S DECISION

On November 7, 2017, ALJ Singh issued her decision, finding that Plaintiff was not disabled for purposes of the Act and did not qualify for SSI.  (*See generally* R. at 12-26.)  In rendering her decision, the ALJ applied the five-step sequential evaluation.  (*Id.*)

## A.    Steps One Through Three of the Sequential Evaluation

At the first step of the evaluation, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the relevant time period.  (R. at 14.)  In this regard, the ALJ noted that Plaintiff had worked during the relevant time period, both as an Operation Aide for a methadone residential program, then as a trainer at a gym.  (*Id.*)  The ALJ, however, characterized Plaintiff's work as an Operation Aide as a "failed work attempt" that did not constitute substantial gainful activity, given that Plaintiff had been terminated from the position after a short time, and had earned only approximately $8,037 from the position, in the first quarter of 2017.  (*Id.*)  The ALJ similarly concluded that Plaintiff's position as a gym trainer, which was part-time only, also did not meet the standard for substantial gainful activity.  (*Id.* at 15.)

At the second step of the evaluation, the ALJ determined that Plaintiff had the severe impairments of post-traumatic stress disorder and gastrointestinal cancer in remission.  (*Id.*)

At the third step, the ALJ concluded that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment.  (*Id.*)  In this regard, the ALJ considered Listing 5.06 ("Inflammatory Bowel Disease"),[50] but concluded that the medical evidence did not support that Plaintiff met the requirements of that Listing.  (*Id.* at 15-16.)

---

[50] Listing 5.06 requires that a claimant suffer from inflammatory bowel disease in conjunction with either "obstruction of stenotic areas . . . in the small intestine or colon with proximal dilation," or any two of the following occurring on at least two occasions, at least 60 days apart, within a consecutive six month period:  (1) anemia with hemoglobin of less than 10.0 g/dL, present on at least two evaluations at least 60 days apart; or (2) serum albumin of 3.0 g/dL or less, present on at least two evaluations at least 60 days apart; or (3) clinically documented tender abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or (4) perineal disease with a draining abscess or fistula, with pain that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or (5) involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least

With respect to Plaintiff's alleged mental impairments, the ALJ determined that Plaintiff did not meet the requirements of Listing 12.15 ("Trauma- and Stressor-Related Disorders").[51] (*Id.* at 16). The ALJ concluded that Plaintiff had mild limitations in understanding, remembering, or applying information, and in adapting and managing himself. (*Id.*) In this regard, the ALJ noted that the Record indicated Plaintiff was able to follow written and spoken instructions and engage in many of the ordinary activities of daily living, and further noted that Plaintiff was able to "follow along" and "answer questions appropriately" during the Hearing. (*Id.*) The ALJ also concluded that Plaintiff had moderate limitations in interacting with others and in maintaining concentration, persistence, or pace. (*Id.*) In reaching this conclusion, the ALJ noted that, although Plaintiff reported difficulties being in crowds, he was able to socialize with his mother and neighbor, taught gym classes, and had a relationship with a girlfriend. (*Id.*) The ALJ also noted that Plaintiff was able to attend medical appointments, handle his finances, and concentrate at the Hearing. (*Id.*) Based on the limitations that the ALJ identified, she concluded that Plaintiff's mental impairments were not sufficiently severe to meet the Paragraph

---

60 days apart; or (6) need for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a central venous catheter. 20 C.F.R. Part 404, Subpart P, Appendix 1.

[51] Listing 12.15 provides that a mental impairment may meet the severity of such Listing if it includes medical documentation of all of the following: (1) exposure to actual or threatened death, serious injury, or violence; (2) subsequent involuntary re-experiencing of the traumatic event; (3) avoidance of external reminders of the event; (4) disturbance in mood or behavior; and (5) increases in arousal and reactivity. In addition, the impairment must meet the requirements of Paragraph B, which requires an extreme limitation in one or a marked limitation in two of the following: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself; or, the impairment must meet the requirements of Paragraph C, which requires a medically documented history of the disorder over a period of at least two years, with ongoing treatment that diminishes the symptoms of the disorder, and marginal adjustment. 20 C.F.R. Part 404, Subpart P, Appendix 1.

B requirements of the Listing. (*Id.*) The ALJ further concluded that the requirements of Paragraph C were also not met. (*Id.* at 17.)

**B.     The ALJ's Assessment of Plaintiff's RFC**

At the fourth step of the ALJ's evaluation, she determined that Plaintiff had the RFC to perform light work, with the following additional restrictions: Plaintiff could only lift and carry 20 pounds occasionally and 10 pounds frequently, and could stand and walk for six hours or sit for up to six hours in an eight-hour workday. (*Id.*) With respect to Plaintiff's mental impairments, the ALJ incorporated additional restrictions, limiting Plaintiff to "understanding and remembering and carrying out simple, routine, repetitive, noncomplex tasks, with occasional contact with supervisors and no contact with the general public." (*Id.*) In making this determination, the ALJ found that Plaintiff had medically determinable impairments that could be expected to produce some of the symptoms that Plaintiff had described in his subjective complaints, but that his "statements concerning the intensity, persistence and limiting effects of these symptoms" were inconsistent with medical evidence in the Record and, ultimately, with the RFC assessment the ALJ developed based on that evidence.

**1.     Findings Regarding Plaintiff's Physical Impairments**

In determining the extent of Plaintiff's physical limitations, the ALJ considered the undated letter written by Dr. Asma Naeem, but gave it "less weight" than other evidence, on the grounds that Dr. Naeem's opinion that Plaintiff "suffer[ed] from extreme pain" did not seem to comport with her treatment notes, and that her opinion was unsupported by any cites to "objective clinical or diagnostic findings." (*Id.* at 22.) The ALJ also gave "less weight" to Dr. Yunus' letter of August 2015, finding that, although Dr. Yunus was a "treating source" for Plaintiff, he neither provided details nor cited to objective clinical findings to support his

conclusions. (*Id.*) The ALJ stated, however, that she was according "more weight" to the opinions that Dr. Yunus set forth in his October 2015 Impairment Questionnaire; specifically, the ALJ found that, despite some inconsistencies in Dr. Yunus's opinion regarding how often Plaintiff might miss work per month, the opinions contained in the questionnaire were generally consistent with a conclusion that Plaintiff could perform light work. (*See id.* at 23.)

The ALJ also considered the opinions of Dr. Asif. Although the ALJ noted that, in his June 2015 report, Dr. Asif had "offer[ed] little explanation" for his conclusions, and, further, that the report was somewhat inconsistent with Dr. Asif's notes of Plaintiff's treatment, the ALJ nonetheless concluded that the opinions contained in that report should be accorded "some weight," to the extent they could be interpreted to support her RFC assessment. (*Id.*) The ALJ gave "more weight" to Dr. Asif's January 2017 questionnaire, in which Dr. Asif opined that Plaintiff could sit, stand, or walk for more than six hours in an eight hour workday and could occasionally carry 10 to 20 pounds, as the ALJ found that this opinion was "generally consistent with the medical evidence as well as [Plaintiff's] activities of daily living." (*Id.* at 23.)

### 2. Findings Regarding Plaintiff's Mental Impairments

In considering Plaintiff's mental impairments, the ALJ first noted that, although Dr. Asif and Dr. Yunus were not treating psychiatrists, the ALJ would consider their opinions as to Plaintiff's mental status to the extent those opinions comported with the medical record as a whole. (*Id.* at 21.)

With respect to Dr. Scherer's opinion, although the ALJ did not state that Dr. Scherer was a "treating physician," the ALJ gave his opinion "more weight," on the grounds that Dr. Scherer "ha[d] had the opportunity to examine and treat [Plaintiff]." (*Id.* at 24.) The ALJ noted that she had considered many of the limitations noted in Dr. Scherer's opinion, and had incorporated

those limitations into her RFC analysis – including a limitation that Plaintiff needed no contact with the general public, consistent with Dr. Scherer's opinion that Plaintiff's only "marked" limitations was in "interacting appropriately with the public." (*Id.*)

The ALJ also considered Plaintiff's testimony at the Hearing, particularly with respect to his claimed limitations in interacting with others, and concluded that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his alleged symptoms were not totally consistent with the medical evidence. (*Id.* at 18, 20.) With respect to the medical treatment evidence, the ALJ noted that, "on numerous examinations," Plaintiff had "consistently" been found to be "alert and/or oriented," and that his psychiatric treatment notes supported the conclusion that his mental status was "within normal limits." (*Id.* at 20-21.) The ALJ further noted that there was no evidence that Plaintiff had problems concentrating or interacting with others in his community college classes, at church, or at his gym classes, and that Plaintiff could perform "a wide variety of activities of daily living." (*Id.* at 21.) The ALJ also noted that there was no evidence in the Record that Plaintiff had been hospitalized for his alleged mental impairments or that Plaintiff had used or had been prescribed any medications for those impairments. (*Id.* at 22.)

Based on this evidence, the ALJ concluded that Plaintiff would be able to understand, remember, and carry out simple, routine, repetitive instructions, and could perform work that involved occasional contact with supervisors and no contact with the general public. (*Id.*)

### C. Steps Four and Five of the Sequential Evaluation

At the fourth step, the ALJ concluded that Plaintiff did not have any past relevant work. (*Id.*) The ALJ further noted that, although Plaintiff was 50 years old on the date when his application was filed, his age category had changed during the relevant time period to "closely

approaching advanced age." (*Id.*) The ALJ concluded that, "[a]lthough a borderline age situation exist[ed] because the [Plaintiff] [was] within a few days to a few months of attaining the next higher age category and use of the higher age category would result in a finding of 'disabled' instead of 'not disabled,' use of this age category [was] not support by the limited adverse impact of all factors on [Plaintiff's] ability to adjust to other work." (*Id.*) Based on the testimony of the VE, the ALJ concluded that, during the relevant time period, jobs existed in the national economy that Plaintiff was able to perform despite his impairments. (*Id.* at 25.)

Thus, in light of Plaintiff's age, education, work experience, and RFC, and based on the ALJ's finding that Plaintiff could have performed other work that existed in the national economy during the relevant time period, the ALJ concluded that, during that period, Plaintiff was not disabled as defined by the Act. (*Id.* at 26.)

## III.     REVIEW OF THE ALJ'S DECISION

In this action, the ALJ used the applicable five-step evaluation in analyzing Plaintiff's claim, and thus the initial question before this Court is whether, in evaluating Plaintiff's claim under this accepted protocol, the ALJ made any errors of law that might have affected the disposition of the claim. If the ALJ did not commit legal error, then the Court must go on to determine whether the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence.

Even generously construing Plaintiff's claims, as the Court is required to do in light of Plaintiff's *pro se* status, it is apparent that Plaintiff does not challenge the ALJ's determinations regarding his physical impairments. (*See generally* Complaint; Pl. Opp.) The only two arguments specifically advanced by Plaintiff appear to be:  (1) that the ALJ failed to accord sufficient weight to the opinion of Dr. Scherer under the treating physician rule; and (2) that

remand is warranted based on the additional evidence that Plaintiff submitted to the Appeals Council and to this Court, in particular the additional evidence regarding Plaintiff's mental impairments. (*See* Pl. Opp., at 1-3.) Taken together and construed liberally, these arguments may also be read, more generally, to challenge the sufficiency of the evidence supporting the ALJ's RFC determination regarding Plaintiff's mental impairments, and her resulting conclusion that Plaintiff was not disabled.

Nonetheless, despite Plaintiff's focus on his mental impairments, the Court – recognizing that Plaintiff is proceeding *pro se* – has initially undertaken to conduct a general review of the ALJ's decision regarding the severity and limiting effects of Plaintiff's claimed physical impairments. Based on that review, as discussed briefly below, the Court finds no material error. As for the arguments that Plaintiff has raised regarding his mental impairments, the Court concludes, for the reasons that follow, that Dr. Scherer cannot be considered to have been Plaintiff's treating physician for purposes of the treating physician rule, and that, in any event, any error by the ALJ in her application of the treating physician rule, with respect to the weight assigned to Dr. Scherer's opinion, was harmless. The Court also finds that the evidence submitted by Plaintiff to the Appeals Council (and to the Court, to the extent that additional evidence can properly be considered), does not warrant remand.

A.    **The ALJ's Decision That Plaintiff's Physical Impairments Did Not Preclude Him From Working Was Supported by Substantial Evidence.**

Even though Plaintiff does not appear to be challenging the ALS's findings regarding his physical impairments, the Court has nonetheless considered those findings, in light of its obligation to construe the pleadings of a *pro se* plaintiff generously. Upon review of the Record, the Court concludes that substantial evidence supports the ALJ's decision with respect to Plaintiff's physical impairments. Specifically, the Court notes that it was appropriate for the ALJ

to have given more weight to the January 2017 opinion of Dr. Asif and the October 2015 opinion of Dr. Yunus than to certain competing opinion evidence, on the grounds that these two opinions were more consistent with the Record as a whole. (R. at 23.) In this regard, the ALJ accurately observed that most of the treatment notes of Dr. Asif and Dr. Yunus reported generally normal findings, and that Plaintiff himself had reported being able to perform various activities of daily living, as well as to work part-time as a trainer at a gym. (*See id.*) Although there were some internal inconsistencies in Dr. Yunus's opinion regarding the extent to which Plaintiff would need to take breaks or be absent from work (*id.* at 326-27), as well as in Dr. Asif's 2015 opinion regarding the length of time that Plaintiff would be able to stand or walk (*id.*, at 309), conflicts in the medical evidence are for the ALJ to resolve (*see* Def. Mem., at 14-15 (citing *Veino,* 312 F.3d at 588)), and the ALJ's resolution of those conflicts was reasonably supported. Finally, the Court finds that the ALJ did not err in rejecting the April 2015 opinion of Dr. Naeem and the August 2015 opinion of Dr. Yunus, both of which contained conclusory statements that Plaintiff was disabled, without any explanation or functional assessment. (R. at 22, 272, 313.) Overall, upon its review of the Record in its entirety, the Court concludes that the ALJ's RFC determination was supported by substantial evidence with respect to Plaintiff's mental impairments.

**B.     The ALJ's Decision That Plaintiff's Mental Impairments Did Not Preclude Him From Working Was Also Supported by Substantial Evidence.**

Plaintiff's principal argument before the Court is that the ALJ failed to apply the treating physician rule, in determining how much weight to assign to the opinion of Dr. Scherer. For the reasons set forth below, the Court concludes that this argument is meritless. Equally meritless is any argument that Plaintiff may be attempting to assert regarding the degree to which the evidence in the Record, taken as a whole and including the supplemental evidence submitted to

the Appeals Council, supported the ALJ's determination regarding the extent of Plaintiff's mental impairments.

### 1. Any Error by the ALJ in Applying the Treating Physician Rule With Respect to Dr. Scherer Was Harmless.

A review of the Record demonstrates that, even if the ALJ did not explicitly state that Dr. Scherer's opinion was entitled to particular deference under the treating physician rule, she nonetheless gave his opinion significant weight in formulating Plaintiff's RFC. (*Id.* at 23-24.) The ALJ expressly noted in her opinion that she gave "more weight" to Dr. Scherer's opinion than to other evidence, "as he ha[d] had the opportunity to examine and treat [Plaintiff]." (*Id.* at 24.) The ALJ also expressly noted that, in formulating Plaintiff's RFC, she had "considered" and included "many of [the] limitations [to which Dr. Scherer had opined]" (*id.*); specifically, she noted that the only marked limitation in Dr. Scherer's assessment – Plaintiff's inability to interact appropriately with the public – had been incorporated into the RFC by the included restriction to only occasional contact with supervisors and no contact with the general public. (*Id.; see Bonilla Mojica v. Berryhill,* 397 F. Supp. 3d 513, 537 (S.D.N.Y. 2019) (limiting Plaintiff to "occasional brief and superficial interaction with supervisors, co-workers and the general public but no face to face interaction with the general public" properly accounted for her "problems interacting with others including irritability, anger, and avoidance").)

Furthermore, the ALJ correctly noted that "overall, [Dr. Scherer's functional assessment] indicated that [Plaintiff] ha[d] mild limitations, with some moderate limitations." (*Id.*) At no point did the ALJ suggest, and the RFC does not reflect, that the ALJ concluded anything about Plaintiff's mental impairments that was inconsistent with, or less severe than, the opinion of Dr. Scherer. Indeed, the ALJ's formulation of Plaintiff's RFC appears to have been generally consistent with Dr. Scherer's opinion and the medical record overall. Any error by the ALJ in

failing to accord the opinion of Dr. Scherer "controlling weight" under the treating physician rule was therefore harmless.

### 2. The ALJ's RFC and Conclusions Regarding Plaintiff's Mental Limitations Were Supported by Substantial Evidence.

In determining whether "substantial evidence" supports that ALJ's conclusions regarding the degree to which Plaintiff was functionally limited by her mental impairments, the Court is limited to considering whether the Record, as supplemented by Plaintiff's later submission to the Appeals Council, contains "such evidence as a reasonable mind might accept as adequate to support" those conclusions. *Richardson*, 402 U.S. at 401; *see also Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Here, Plaintiff's medical records and testimony, along with the functional assessment of Dr. Scherer, provide substantial evidence to support the ALJ's conclusion that the limitations that she incorporated into the RFC were adequate to account for Plaintiff's mental impairments.

As a preliminary matter, the medical evidence of record regarding Plaintiff's mental impairments during the relevant period is scarce. Plaintiff apparently received treatment for his mental health only in December of 2015, and from March to September of 2017. (R. at 328-30, 397-409.) During most of the period under review, Plaintiff was apparently able to maintain part-time work at a gym, to attend church, and to conduct various activities of daily living, while receiving no treatment for his claimed mental impairments. (*See* R. at 53-54, 85.) His treatment records also indicate that, during the period at issue, he never required hospitalization or in-patient treatment for any psychiatric problem, and that his providers never recommended, nor did Plaintiff ever request, any medication to treat any mental-health condition. (*Id*. at 260-63, 320.)

With respect to the severity of Plaintiff's mental impairments, although Dr. Marshall noted in 2015 that Plaintiff reported hallucinations, Plaintiff denied any such symptoms during his March 21, 2017 mental status evaluation. (R. at 328, 405-06.) Dr. Marshall also noted that Plaintiff was experiencing paranoid and anxious thoughts, but gave no indication as to how those symptoms impacted Plaintiff's activities of daily living or his ability to hold employment. (*Id.* at 328-30.) By contrast, although Plaintiff reported nightmares and flashbacks in 2017, and was noted to have a "tense" and "guarded" presentation, Plaintiff's mental status evaluation returned otherwise largely normal findings. (*Id.* at 404-06.) Although Dr. Scherer's Mental Impairment Questionnaire suggested that Plaintiff had certain limitations interacting with others and with concentration, he otherwise did not note any significant limitations in Plaintiff's ability to engage in activities relevant to his capacity to work. (*Id.* at 392-95.)

Nor did Plaintiff's subjective complaints regarding his mental health symptoms suggest that his conditions significantly affected his activities of daily living. At the hearing, the majority of Plaintiff's testimony was focused on his symptoms of paranoia and anxiety, particularly around co-workers or attendees at his gym classes. (*Id.* at 51-71, 73-75.) Nonetheless, Plaintiff testified that he had been employed part-time as a trainer, that he had attended church until he decided to stop because he felt "out of place" attending alone, and that he had attended some community college. (*Id.* at 53-54, 85.) Plaintiff's Function Report also indicated that Plaintiff prepared his own meals, used public transportation, and had no problems getting along with family, friend, neighbors, or authority figures. (*Id.* at 220-24.) Plaintiff did report issues with concentration (*id.* at 72, 220-24); and although Dr. Marshall noted in 2015 that Plaintiff's memory and concentration were "intact" (*id.* at 328), Dr. Scherer noted some

difficulty thinking or concentrating, and several moderate or moderate-to-marked limitations

with respect to Plaintiff's concentration and persistence (*id.* at 394-95).

The Court concludes that a reasonable mind could accept this evidence as sufficient to

support the ALJ's conclusion that Plaintiff had mild limitations in understanding, remembering,

or applying information and in adapting and managing himself, and moderate limitations in

interacting with others and in concentrating, persisting, or maintaining pace.  (*Id.* at 16.)  In her

RFC assessment, giving Plaintiff "the benefit of the doubt" (*id.* at 22), the ALJ appropriately

accounted for these limitations by determining that Plaintiff was restricted to understanding,

remembering, and carrying out simple, routine, repetitive, noncomplex tasks; occasional contact

with supervisors; and no contact with the general public.  (*Id*. at 17; *see Del Carmen*

*Fernandez v. Berryhill*, No. 18cv326 (JPO), 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019)

(affirming ALJ's determination that moderate-to-marked limitations "in [the plaintiff's] ability to

deal with stress, maintain a schedule, and make decisions . . .  were consistent with a capacity to

perform medium exertion unskilled work" (internal citations omitted)); *Duffy v. Comm'r of Soc.*

*Sec.*, No. 17cv3560 (GHW) (RWL), 2018 WL 4376414, at *19 (S.D.N.Y. Aug. 24, 2018) ("Mild

or moderate limitations in concentration do not necessarily establish that a claimant is disabled,

particularly where the ALJ limits the scope of work to unskilled, repetitive work."), *report and*

*recommendation adopted*, 2018 WL 4373997 (Sept. 13, 2018).)

In particular, the ALJ's RFC determination cannot be found to have been deficient

because, at the point of formulating Plaintiff's RFC, the ALJ failed to make explicit mention of

Plaintiff's limitations in maintaining concentration, persistence, and pace.  *See McIntyre v.*

*Colvin*, 758 F.3d 146 (2d Cir. 2014).  In *McIntyre*, a claimant specifically challenged an ALJ's

failure to incorporate the claimant's limitations in concentration, persistence, and pace into hypotheticals presented to a VE. *See id*. at 152. The Second Circuit held that

> [A]n ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by the record) is harmless error if (1) medical evidence demonstrates that [the] claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly account[ed] for [the] claimant's limitations in concentration, persistence, and pace.

*Id*. (internal quotation marks and citation omitted). As to the first part of this holding, the evidence of record in this case reflects, as noted above, that Plaintiff was generally able to perform activities of daily living and even worked part-time, suggesting that his mental impairments did not prevent him from engaging in simple, routine tasks. Additionally, the ALJ, in questioning the VE, explicitly incorporated a restriction to simple, routine tasks, and then ultimately included that restriction in her RFC determination. (*Id*. at 17, 87-88.) As to the alternative portion of the *McIntyre* holding, the ALJ expressly noted that she had "considered many of [Dr. Scherer's] limitations in the [RFC]" by incorporating the restriction to simple, routine tasks, occasional contact with supervisors, and no contact with the general public (*id*. at 24), impliedly accounting for the restrictions in concentration, pace, and persistence noted in Dr. Scherer's opinion. For these reasons, any legal error committed by the ALJ in failing to incorporate an explicit limitation regarding concentration, persistence, and pace into her hypothetical to the VE (and, by extension, into the RFC determination) was harmless. *Compare McIntyre*, 758 F.3d at 152, *with Stellmaszyk,* 2018 WL 4997515, at *26 (recommending remand where "lack of clarity in the Record and a lack of transparency in the ALJ's reasoning deprive[d] the Court of the ability to conduct a meaningful harmless-error review").

Finally, nothing in the supplemental evidence submitted by Plaintiff to the Appeals Council introduces uncertainty about the ALJ's RFC assessment, sufficient to warrant remand. Although that additional evidence must now be considered to be part of the Record, *see Perez,* 77 F.3d at 46, it either reflects the same information that had already been placed before the ALJ, or, to the extent it presents new information, it does not suggest that Plaintiff's symptoms, during the relevant period, were any worse than the ALJ found, or that his ability to function was more impaired than the RFC indicated. (*See* R. at 32-42.) With respect to Plaintiff's mental impairments, in particular (which, as noted above, are the sole focus of his present challenge to the Commissioner's disability determination), the additional evidence includes updated treatment notes of Dr. Scherer from September of 2017, in which Dr. Scherer affirmatively stated that Plaintiff's "symptom presentation [had] not changed since intake." (R. at 41.)[52]

This Court therefore finds that the ALJ's findings regarding Plaintiff's mental impairments, as well as the ALJ's RFC determination with respect to any mental limitations, were supported by substantial evidence.

### C. The Additional Evidence Submitted by Plaintiff to This Court Does Not Warrant Remand.

As noted above, for the Court to consider the evidence separately submitted by Plaintiff to the Court, after the commencement of this action, the Court must find (1) that this supplemental evidence is new; and (2) that it is "material," because it is both probative and relevant to the time period at issue. *Tirado,* 842 F.2d at 597. In this case, none of the

---

[52] As for Plaintiff's physical impairments, the evidence submitted to the Appeals Council also appears to add nothing that would be material to the RFC determination. Certainly, Plaintiff has offered no explanation as to why the submitted findings of his echocardiogram, or the diagnosis of testicular hypofunction noted by Advanced Urology Centers of New York (*see id.* at 34-39), should require the ALJ to reassess whether, during the relevant period, Plaintiff was able to perform consistent with his assessed RFC.

supplemental evidence submitted by Plaintiff to the Court meets these requirements. With respect to Plaintiff's letter informing the Court that he was incarcerated for 24 years, seven of which were allegedly spent in solitary confinement (Dkt. 12), the Court notes that Plaintiff testified to those facts at the Hearing before the ALJ (R. at 81), and Plaintiff's assertion that his incarceration "has never been mentioned" with respect to his application (*see* Dkt. 12) is therefore incorrect.

With respect to the additional reports of Dr. Scherer (Dkts. 9-10, 19-20), the Court notes that the relevant time period in this case is from April 24, 2015, to November 7, 2017 (*see* Background, *supra*, at Section B), but the supplemental treatment records submitted by Plaintiff evidence his treatment after that time period, from December of 2017 to December of 2019 (*see* Dkts. 9-10, 19-20). "While documents generated after the ALJ's decision may bear upon the severity and continuity of impairments existing during the relevant period . . . if the new evidence concerns only the claimant's condition after the relevant time period, a remand for consideration of this evidence is not appropriate." *Collins v. Comm'r of Soc. Sec.*, 960 F. Supp. 2d 487, 500-01 (S.D.N.Y. 2013) (internal citations and quotation marks omitted). Here, the new evidence relates only to treatment after the relevant time period, and it "suggests at most that [Plaintiff's] condition worsened after the ALJ's decision." *Id.* As this evidence does not offer any opinion or assessment purporting to relate, retrospectively, to Plaintiff's condition during the relevant time period, remand for consideration of the new evidence would be inappropriate. *See id.* (citing *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004); *Stober v. Astrue*, No. 3:09cv1014 (SRU) (WIG), 2010 WL 7864971, at *16 (D. Conn. Jul. 2, 2010)).

**CONCLUSION**

For all of the foregoing reasons, Defendant's motion for judgment on the pleadings

(Dkt. 16) is granted, Plaintiff's cross-motion for judgment on the pleadings (Dkt. 18) is denied,

and the decision of the Commissioner is AFFIRMED.  The Clerk of Court is directed to close

this case on the Court's Docket.

Dated:  New York, New York
      March 18, 2020

                              SO ORDERED

                              DEBRA FREEMAN
                              United States Magistrate Judge

Copies to:

All counsel (via ECF)

Genaro Campos
60 Boxwood Road
Yonkers, NY 10710